UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

_____

Rodriguez A. Bembo,

                                    Plaintiff,                          **Report and Recommendation**

                    v.                                                            13-CV-413V

County of Niagara et al.,

                                    Defendants.

_____

## I.    INTRODUCTION

        The Hon. Lawrence J. Vilardo has referred this case to this Court under 28 U.S.C.

§ 636(b).  (Dkt. No. 61.)  Pending before the Court is a motion for summary judgment by

defendants County of Niagara, Jeffery Kolbe ("Kolbe"), Benjamin Phillips ("Phillips"), and Jeffery

Shawver ("Shawver") under Rule 56 of the Federal Rules of Civil Procedure ("FRCP").  (Dkt. No.

31.)  In short, plaintiff Rodriguez Bembo ("Bembo") has claimed that defendants used excessive

force against him during an incident on January 11, 2012 at the Niagara County Jail.  Bembo has

claimed further that the alleged incident caused him injuries to which defendants were deliberately

indifferent.  Defendants in their motion argue that Bembo suffered no serious injuries during the

incident in question and that, even if their response to Bembo's medical complaints could

constitute negligence, the situation comes nowhere near the threshold for deliberate indifference.

Additionally, defendants set forth that any force that they used against Bembo on January 11,

2012 was proportional to Bembo's misconduct that day.  Bembo responds that a trial jury needs to

sort through the discrepancies in the record between each side's version of the force used on

January 11, 2012 and the medical attention that Bembo eventually needed as a result.

The parties proceeded to oral argument before Judge Vilardo on June 13, 2016.  (Dkt. No. 54.)  This Court has reviewed the transcript of the oral argument and has resolved an offshoot discovery issue that stemmed from it.  (Dkt. No. 63.)  After considering the parties' positions from their papers and from the oral argument with Judge Vilardo, the Court respectfully recommends granting defendants' motion in part as explained below.

## II.   BACKGROUND

### A.  Events of January 11, 2012

This case concerns allegations that defendants injured Bembo's right wrist during an incident at the Niagara County Jail on January 11, 2012.  Prior to that date, corrections officers became aware that pictures of naked women were posted on the bottom of the top bunk in Bembo's cell.  Bembo denies that the pictures were his or that he posted them; defendants do not appear to be arguing about ownership.  However the pictures came into place, the parties do not dispute that corrections officers ordered Bembo twice to remove them—once prior to January 11 and once on January 11.  (Dkt. No. 31-5 at 57, 58; Dkt. No. 31-14 at 2.)  Bembo refused to remove the pictures each time on the basis that he did not post them.  As a sanction for not following a direct order, corrections officer William Fleck ("Fleck") ordered Bembo to lock into his cell for a 24-hour period.  Bembo did not lock in, claiming that another officer had told him that doing so was unnecessary.  (Dkt. No. 31-5 at 35.)  Bembo instead, according to defendants, became verbally loud and abusive and threw his lunch at Fleck.  (Dkt. No. 31-5 at 36.)

Other corrections officers responded to the scene immediately.  Shawver handcuffed Bembo with his hands behind his back.  (Dkt. No. 31-5 at 37, Dkt. No. 31-7 at 29.)  Phillips and Shawver took Bembo from his cell and pod and walked him to a disciplinary area of the jail on

another floor, referred to as the punitive segregation area.  For the walk, Bembo remained with his hands behind his back; he also was strapped to an emergency response belt for stability.  (Dkt. No. 31-7 at 51; Dkt. No. 31-8 at 21.)  One officer escorted Bembo on each side while Kolbe accompanied them.  (Dkt. No. 31-6 at 16–17.)  During the walk, Phillips and Shawver applied pressure twice to each of Bembo's wrists, Phillips on the left and Shawver on the right.  (Dkt. No. 31-6 at 19, 30.)  Phillips could not recall how long the pressure lasted; Shawver believed that it lasted a second or two.  (Dkt. No. 31-6 at 33; Dkt. No. 31-7 at 31, 48.)  Bembo claims that the wrist compliance technique was unprompted; Phillips and Shawver claim that they applied pressure in response to continued abusive conduct by Bembo.  (Dkt. No. 31-5 at 36; Dkt. No. 31-6 at 17–18, 28; Dkt. No. 31-7 at 29.)  Corrections officers receive training for this technique, though from whom is not clear.  (Dkt. No. 31-6 at 10–11; Dkt. No. 31-7 at 41.)  Wrist compliance is designed to subdue an inmate by inducing discomfort for up to two seconds.  (Dkt. No. 31-6 at 31.)  When the officers arrived with Bembo to the elevator to go to the other floor, another incident occurred over which the parties disagree sharply.  The officers contend that, in the elevator, Bembo suddenly started head-butting the wall of the elevator for no apparent reason.  (Dkt. No. 31-6 at 19–20; Dkt. No. 31-7 at 25.)  Bembo's conduct prompted Kolbe to apply mandibular pressure to subdue Bembo again.  Mandibular pressure is similar to the wrist-compliance technique.  (Dkt. No. 31-7 at 34; Dkt. No. 31-8 at 15.)  Bembo agrees that something happened in the elevator but insists that Kolbe grabbed his head and banged it into the elevator wall.  (Dkt. No. 31-5 at 40.)  The rest of the transport appears to have concluded without incident.  (Dkt. No. 31-6 at 20.)  At no time did Sawver feel threatened by Bembo on January 11, 2012.

3

(Dkt. No. 31-7 at 42.)  Kolbe considered Bembo's throwing of his lunch at Fleck to be a threat. (Dkt. No. 31-8 at 54.)

The record contains copies of incident reports that defendants filed internally after the events of January 11, 2012 concluded.  One report documented the discovery of inappropriate pictures in Bembo's cell and the order to remove them.  (Dkt. No. 31-14 at 2.)  One report documented Bembo's refusal to lock into his cell along with his verbally loud and abusive conduct and his throwing of his lunch.  (Dkt. No. 31-14 at 3.)  Three other reports, one each from Phillips, Shawver, and Kolbe, documented defendants' narrative that Bembo needed the wrist-compliance and mandibular-pressure techniques because of his conduct and that Bembo banged his own head against the elevator wall.  (Dkt. No. 31-14 at 4–6.)

As a postscript to the events of January 11, 2012, Bembo later faced internal disciplinary proceedings.  Bembo was found guilty of disobeying a direct order and of disruptive behavior; he was found not guilty of posting the inappropriate pictures and of failing to lock into his cell.  (Dkt. No. 31-8 at 58–59.)

### B.  Bembo's Medical History

For the rest of his time at the Niagara County Jail, until released on February 2, 2012, Bembo took a conflicted approach to the injury that he felt that he suffered in his right wrist. After the events of January 11, 2012 ran their course and Bembo was in punitive segregation, he asked to see a nurse about his right wrist.  Bembo complained that his wrist looked as if it had a "knot" and swelling in it, and he wondered whether he had suffered a fracture.  (Dkt. No. 31-5 at 42–43.)  Later that day, Bembo asked a corrections officer for a request form that would allow him to request further medical evaluation.  (Dkt. No. 31-5 at 45.)  Bembo never received the request

form but did not attribute the failure to malice. "I won't say Officer Kenny really paid much attention to it, so maybe he may have forgotten during all the stuff, because I wouldn't say Officer Kenny would forget to give me the slip `cause he's not a bad guy. He probably just forgot to give it to me that day. There's no reason to get a slip after I [had] seen the nurse and he [had] seen the knot and said nothing was wrong." (Dkt. No. 31-5 at 45–46.) Bembo would mention to a nurse daily that something felt wrong in his wrist but did not pursue further treatment. "I didn't ask for nothing else. I already knew what was going on. There's no service, you ain't gonna get no service." (Dkt. No. 31-5 at 46; *see also id.* at 71.) Bembo did not mention his wrist during a doctor visit on January 25, 2012. (Dkt. No. 31-5 at 49.) Importantly, Bembo did not request any further medical treatment for his right wrist. (Dkt. No. 31-5 at 72.)

The parties dispute sharply how Bembo's right wrist looked before and after January 11, 2012 and what factors might have played a role. Bembo acknowledged that working out might have caused soreness in his right wrist that would have prompted a doctor's visit on June 28, 2011. (Dkt. No. 31-5 at 67.) Bembo saw Dr. Robert Lutnick ("Lutnick"), who evaluated him for a complaint of wrist pain. (Dkt. No. 42-8 at 1.) After taking and evaluating an x-ray, Lutnick noted that "[f]our views of the right wrist reveal no evidence of acute fracture or destructive bony lesion. The wrist joint spaces appear preserved. The bone density is normal. Surrounding soft tissue is unremarkable." (Dkt. No. 42-8 at 2.) Lutnick concluded with the notation, "IMPRESSION: NORMAL RIGHT WRIST." (Dkt. No. 42-8 at 2.) While he was at the Niagara County Jail, Bembo might have thrown punches with his right hand during a fight with a fellow inmate, and the fight might have exacerbated any injury in his right wrist. (Dkt. No. 31-5 at 103–06.) After his

5

release, Bembo saw Dr. Randall Loftus ("Loftus") on February 29, 2012 for a complaint of right

wrist pain.  (Dkt. No. 42-9 at 1.)  Loftus arranged for an x-ray and prepared an x-ray report.  In his

x-ray report, Loftus made the following findings and impressions:

> There is no evidence of acute fracture or dislocation of the right wrist.  No focal
> bony erosions are evident.  Mild widening of the scapholunate interval is noted
> suggestive of possible underlying ligamentous injury.  Minimal degenerative
> changes are noted at the radiocarpal joint.  Slight deformity is noted at the
> scaphoid bone possibly representing old post traumatic change.  Minimal
> degenerative changes are noted at the first carpal metacarpal joint.  There is no
> evidence for abnormal calcifications or retained radiopaque foreign bodies present
> in the adjacent soft tissues.

(Dkt. No. 42-9 at 2.)  Defendants' experts dispute any interpretation of Bembo's 2011 and 2012 x-

rays that suggests changes from a normal wrist.  One expert, Dr. Kevin Lanighan ("Lanighan"),

interpreted the 2011 x-ray to show a pre-existing ligament injury in Bembo's right wrist.  (Dkt. No.

31-9 at 3.)  Another expert, Dr. Angelo DelBalso ("DelBalso"), agreed that the 2011 x-ray did not

show a normal right wrist.  (Dkt. No. 31-10 at 5.)  Meanwhile, Bembo underwent surgery on May

24, 2012 to address the scapholunate interval in his right wrist.  (Dkt. No. 42-11 at 3.)  The right

wrist had some swelling about a month prior to the surgery, coupled with persistent pain and

marked functional impairment.  (Dkt. No. 42-11 at 1.)  A postsurgical follow-up exam on

November 27, 2012 indicated weak grip strength.  (Dkt. No. 42-11 at 5.)

### C.  This Case and the Pending Motion

Bembo commenced this case by filing his summons and complaint on April 26, 2013.

(Dkt. No. 1.)  The complaint contains four claims.  In his first claim, Bembo accuses defendants of

deliberate indifference to his medical care, in violation of the Eighth Amendment via 42 U.S.C.

§ 1983.  Phillips, Shawver, and Kolbe, according to Bembo, are liable through direct conduct,

while the County of Niagara is liable because its employees "followed policies of malicious abuse of prisoners. These policies failed to administer medical care to Plaintiff for his serious injury despite his many requests and indications of infliction of pain." (*Id.* at 6.) In his second claim, Bembo accuses defendants of excessive force, in violation of the Eighth Amendment, for the events of January 11, 2012. In his third claim, a claim under New York law, Bembo accuses defendants of intentional infliction of emotional distress, again for the events of January 11, 2012. In his fourth claim, also a claim under New York law, Bembo accuses defendants of negligent infliction of emotional distress. Following some motion practice under FRCP 12, defendants answered the complaint on October 8, 2013. (Dkt. No. 10.)

Defendants filed the pending motion on January 29, 2016. Defendants seek judgment in their favor for several reasons. Bembo, according to defendants, did not suffer any injury on January 11, 2012 serious enough to warrant consideration of deliberate indifference. Defendants also point out that Bembo did not seek and was not denied any sort of medical treatment that would have spared him a significant risk of serious harm. With respect to the claim for excessive force, defendants argue that they used proportional force on January 11, 2012 to control Bembo after he threw objects at a corrections officer and became verbally loud and abusive. As for the two claims pertaining to emotional distress, defendants argue that Bembo has made no showing of emotional distress and that any claim for negligent infliction would be duplicative of other claims in the complaint. If defendants prevail on all of Bembo's claims then they request costs and fees for the time spent defending allegations that they consider frivolous.

Bembo opposes defendants' motion in all respects.  Bembo asserts that triable questions of fact surround his level of compliance during the events of January 11, 2012 and that a jury needs to resolve why defendants applied or condoned force when he was compliant.  Bembo points to deposition testimony from the officers suggesting that the County had a policy that governed the use of force here.  Bembo argues that a jury needs to examine his claim of deliberate indifference as well.  Bembo has submitted the 2011 and 2012 x-rays and x-ray reports indicating new injuries that he ties to the events of January 11, 2012.[1]  Considering that he eventually needed surgery and that he mentioned his injury to a nurse daily, Bembo concludes that triable questions of fact surround the extent to which defendants ignored his complaints.  As for the emotional-distress claims, Bembo stands by his deposition testimony that defendants both used unnecessary force and intentionally banged his head against the elevator wall.  Bembo believes that a jury should review defendants' conduct to determine how extreme and outrageous it was.

III.   DISCUSSION

A.  *Summary Judgment Generally*

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  FRCP 56(a).  "As to materiality, the substantive law will identify which facts are material.  Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment . . . . More important for present purposes, summary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a

---

[1] Whether medical reports by themselves could create triable questions of fact became an issue during oral argument before Judge Vilardo.  (*See generally* Dkt. No. 54 at 24–32; Dkt. No. 63.)  The Court will address the issue below briefly, to the extent necessary.

reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (citation omitted). "The party seeking summary judgment has the burden to demonstrate that no genuine issue of material fact exists. In determining whether a genuine issue of material fact exists, a court must examine the evidence in the light most favorable to, and draw all inferences in favor of, the non-movant . . . . Summary judgment is improper if there is any evidence in the record that could reasonably support a jury's verdict for the non-moving party." *Marvel Characters, Inc. v. Simon*, 310 F.3d 280, 286 (2d Cir. 2002) (citations omitted). "Where, as here, the nonmovant would bear the burden of proof at trial, the movant may show prima facie entitlement to summary judgment by either (1) pointing to evidence that negates its opponent's claims or (2) identifying those portions of its opponent's evidence that demonstrate the absence of a genuine issue of material fact." *Barlow v. Male Geneva Police Officer who Arrested me on Jan. 2005*, 434 F. App'x 22, 25 (2d Cir. 2011) (summary order) (internal quotation and editorial marks and citation omitted).

## B. Deliberate Indifference

With the general principles for summary judgment in mind, the Court first turns to Bembo's claim for deliberate indifference. "In order to establish an Eighth Amendment claim arising out of inadequate medical care, a prisoner must prove deliberate indifference to his serious medical needs. The standard of deliberate indifference includes both subjective and objective components. First, the alleged deprivation must be, in objective terms, sufficiently serious. Second, the defendant must act with a sufficiently culpable state of mind. An official acts with the requisite deliberate indifference when that official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be

drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Chance v. Armstrong*, 143 F.3d 698, 702 (2d Cir. 1998) (internal quotation and editorial marks and citations omitted).  "[A] medical need is sufficiently serious if it is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Hunt v. Uphoff*, 199 F.3d 1220, 1224 (10th Cir. 1999) (citation omitted).

Here, a reasonable jury would not be able to find for Bembo for either the objective or subjective components of his claim for deliberate indifference.  Construing all facts and inferences in Bembo's favor, Bembo at worst suffered some kind of displacement or hyperextension in his right wrist as a result of the events of January 11, 2012.  Bembo suffered no fractures, cuts, tears, lacerations, or neuropathy.  *Cf. Bennett v. Hunter*, No. 9:02CV1365, 2006 WL 1174309, at *3 (N.D.N.Y. May 1, 2006) (granting summary judgment where, *inter alia*, a pinched wrist nerve generally was not considered a serious medical need); *Miles v. County of Broome*, No. 3:04-CV-1147, 2006 WL 561247, at *7 (N.D.N.Y. Mar. 6, 2006) (granting summary judgment where, *inter alia*, wrist trauma including a fracture was not likely to cause death or degeneration).  On the day of the incident and on January 25, 2012, Bembo had a medical provider look at the wrist.  Bembo did not seek any other treatment while he was in the Niagara County Jail.  *Cf. Green v. Senkowski*, 100 F. App'x 45, 46 (2d Cir. 2004) (summary order) (affirming summary judgment where "prison medical records show that in his six months at Clinton, [plaintiff] complained about his wrists on only two of sixteen infirmary visits").  Bembo has hinted at a culture of fear or intimidation that prevented him from pursuing formal requests for care, but he has not demonstrated how he was

actually prevented.  Bembo instead has testified that he gave the benefit of the doubt to a

corrections officer who failed to give him a medical request form.  (Dkt. No. 31-5 at 46); *see*

*Salahuddin v. Goord*, 467 F.3d 263, 281 (2d Cir. 2006) ("The charged official must be subjectively

aware that his conduct creates such a risk . . . .  The defendant's belief that his conduct poses no

risk of serious harm (or an insubstantial risk of serious harm) need not be sound so long as it is

sincere.  Thus, even if objectively unreasonable, a defendant's mental state may be nonculpable.")

(citations omitted).  In short, for the brief time that Bembo was in the Niagara County Jail, he

received medical attention proportional to his symptoms and his requests.  That Bembo later

needed surgery reveals, at the very most, that medical providers at the jail were not aggressive

enough in identifying a developing chronic condition.  Such a failure of aggressive prevention,

however, would at most amount to medical malpractice and would fall well short of conscious

disregard of an excessive risk to Bembo's health and safety.  "It is well-established that mere

disagreement over the proper treatment does not create a constitutional claim.  So long as the

treatment given is adequate, the fact that a prisoner might prefer a different treatment does not

give rise to an Eighth Amendment violation.  Moreover, negligence, even if it constitutes medical

malpractice, does not, without more, engender a constitutional claim."  *Armstrong*, 143 F.3d at

703.  Under these circumstances, no reasonable jury would allow Bembo to prevail at trial on a

theory of deliberate indifference.  The Court thus recommends granting defendants' motion for

the first claim of the complaint.

## C.  Excessive Force

The Court next examines Bembo's claim for excessive force.  "As we have said many times,

§ 1983 is not itself a source of substantive rights, but merely provides a method for vindicating

federal rights elsewhere conferred.  In addressing an excessive force claim brought under § 1983,

analysis begins by identifying the specific constitutional right allegedly infringed by the challenged

application of force."  *Graham v. Connor*, 490 U.S. 386, 393–94 (1989) (internal quotation marks

and citations omitted).  Courts assess claims for excessive force as possible violations of the Eighth

Amendment prohibition on cruel and unusual punishment.  A key factor in such claims is

establishing some level of intent or consciousness associated with the allegedly excessive force.  "It

is obduracy and wantonness, not inadvertence or error in good faith, that characterize the conduct

prohibited by the Cruel and Unusual Punishments Clause, whether that conduct occurs in

connection with establishing conditions of confinement, supplying medical needs, or restoring

official control over a tumultuous cellblock.  The infliction of pain in the course of a prison

security measure, therefore, does not amount to cruel and unusual punishment simply because it

may appear in retrospect that the degree of force authorized or applied for security purposes was

unreasonable, and hence unnecessary in the strict sense."  *Whitley v. Albers*, 475 U.S. 312, 319

(1986).  The Second Circuit has explained how the analysis of a claim for excessive force unfolds

in two stages:

> A claim of cruel and unusual punishment in violation of the Eighth Amendment
> has two components—one subjective, focusing on the defendant's motive for his
> conduct, and the other objective, focusing on the conduct's effect.  The subjective
> component of the claim requires a showing that the defendant had the necessary
> level of culpability, shown by actions characterized by wantonness in light of the
> particular circumstances surrounding the challenged conduct.  When prison
> officials are accused of using excessive force, the wantonness issue turns on whether
> force was applied in a good-faith effort to maintain or restore discipline, or
> maliciously and sadistically to cause harm.  The objective component of a claim of
> cruel and unusual punishment focuses on the harm done, in light of contemporary
> standards of decency.  In assessing this component, the court must ask whether the
> alleged wrongdoing was objectively harmful enough to establish a constitutional

violation.  But when prison officials use force to cause harm maliciously and
sadistically, contemporary standards of decency always are violated . . . . This is true
whether or not significant injury is evident.  Accordingly, where a prisoner's
allegations and evidentiary proffers could reasonably, if credited, allow a rational
factfinder to find that corrections officers used force maliciously and sadistically,
our Court has reversed summary dismissals of Eighth Amendment claims of
excessive force even where the plaintiff's evidence of injury was slight and the proof
of excessive force was weak.

*Wright v. Goord*, 554 F.3d 255, 268–69 (2d Cir. 2009) (ellipsis in original) (internal quotation

marks and citations omitted).

Here, the dispute between the parties about what happened on January 11, 2012 is

"material," for summary-judgment purposes, because it directly affects what Bembo would have to

prove at trial to establish an Eighth Amendment violation.  Defendants' incident reports confirm

two applications of the wrist-compliance technique and contact between Bembo's head and the

wall of the elevator.  The incident reports also confirm that Bembo was handcuffed when wrist

compliance was used and when his head made contact with the elevator wall; defendants

additionally have confirmed that Bembo's hands were handcuffed behind his back.  Each side,

though, has a very different narrative.  Bembo has testified that he was compliant when Phillips

and Shawver used the wrist-compliance technique against him.  Defendants disagree, and the

disagreement affects whether they applied force in good faith, especially since they did not feel

threatened by Bembo.  (*See, e.g.*, Dkt. No. 31-7 at 42.)  Bembo has testified further that Kolbe

intentionally banged his head against the elevator wall.  Defendants contend that Bembo banged

his own head into a wall; the disagreement between the parties is so stark that resolving it could

mean the difference between a use of proportional force and objectively harmful abuse.  The

record thus contains a question of fact as to what level of conduct Bembo was exhibiting and why

defendants had to apply force to someone under physical restraint.  If the parties' dispute breaks in Bembo's favor then Bembo would have established that he was restrained and not threatening anyone when Phillips, Shawver, and Kolbe intentionally banged his head into a wall and used force that caused some kind of problem with his right wrist.  Under those circumstances, Bembo's narrative potentially would fulfill the substantive requirements of a claim for excessive force.

The critical question, then, is whether the dispute between the parties about the events of January 11, 2012 happens to be genuine.  In large part, Bembo is relying on his own testimony to corroborate his account of what happened between him and Phillips, Shawver, and Kolbe.  "While it is undoubtedly the duty of district courts not to weigh the credibility of the parties at the summary judgment stage, in the rare circumstance where the plaintiff relies almost exclusively on his own testimony, much of which is contradictory and incomplete, it will be impossible for a district court to determine whether the jury could reasonably find for the plaintiff, and thus whether there are any 'genuine' issues of material fact, without making some assessment of the plaintiff's account.  Under these circumstances, the moving party still must meet the difficult burden of demonstrating that there is no evidence in the record upon which a reasonable factfinder could base a verdict in the plaintiff's favor." *Jeffreys v. City of New York*, 426 F.3d 549, 554 (2d Cir. 2005) (internal quotation marks and citations omitted).  Assessing Bembo's deposition testimony, the Court finds some contradictions that could raise a reasonable juror's eyebrow.  Bembo chose not to lock into his cell without clarifying what he claimed were different orders from different corrections officers on that issue.  Bembo testified that he asked for no further medical treatment but also testified that he mentioned his wrist every day.  (Dkt. No. 31-5

at 46.)  Bembo could not remember seeing a doctor on January 25, 2012.  (Dkt. No. 31-5 at 49.)

Bembo also contradicted parts of the narrative in his own complaint.  (Dkt. No. 31-5 at 52.)  Yet

Bembo was candid about throwing his lunch at Fleck.  More importantly, the parties agree that

wrist compliance was used twice, whatever the exact circumstances.  *Cf. Nicholas v. Harder*, 637 F.

App'x 51, 53 (2d Cir. 2016) (summary order) ("Although several of the witnesses disputed

Appellant's version of events, the mere fact that the jury ultimately chose to disbelieve Appellant

did not render her claim frivolous.  Moreover, contrary to Appellees' arguments as to the medical

evidence, Appellant's trial evidence, including conclusions rendered by her treating doctors,

supported her claim that the trauma of the handcuffs could have exacerbated the underlying

arthritis in her wrists.  Even though Appellant's excessive force claim was not particularly strong, it

was not frivolous, unreasonable, or groundless."); *Usavage v. Port Auth. of New York & New Jersey*,

932 F. Supp. 2d 575, 595 (S.D.N.Y. 2013) (denying summary judgment in a case involving alleged

compression of handcuffs, where "Plaintiff has described a course of events that creates a genuine

dispute of fact as to each element of an excessive force claim").  The Court cannot resolve as a

matter of law how compliant Bembo was or how disruptive he was as Phillips, Shawver, and Kolbe

took him to punitive segregation.  *Cf. Lin v. Cty. of Monroe*, 66 F. Supp. 3d 341, 361 (W.D.N.Y.

2014) ("[G]ranting summary judgment in favor of [a sheriff's deputy] would require the Court to

make a factual determination as to whether Plaintiff resisted the deputies while they were

attempting to apply handcuffs to his wrists, such that the deputies properly responded by

slamming Plaintiff to the ground and placing a knee on his head and back.  Again, this type of

factual determination is appropriate for a jury–not for a Judge.").  The parties agree further that

15

something happened in the elevator that caused Bembo's head to come into contact with the elevator wall.  Bembo appears not to have pursued medical treatment for his head, but the severity of any injuries that he suffered would not necessarily negate his allegation of excessive force if a jury chose to believe his narrative.  *Cf. Robison v. Via*, 821 F.2d 913, 924 (2d Cir. 1987) ("If the force used was unreasonable and excessive, the plaintiff may recover even if the injuries inflicted were not permanent or severe.").  "In short, although the credibility of plaintiff's testimony concerning the alleged assault is certainly inconsistent with other evidence and is subject to serious question, it is not so blatantly false that the Court may simply reject it as a matter of law."  *Moore v. Casselberry*, 584 F. Supp. 2d 580, 587 (W.D.N.Y. 2008); *see also Rossi v. Stevens*, No. 04-CV-01836, 2008 WL 4452383, at *6 (S.D.N.Y. Sept. 30, 2008) ("In this case, Plaintiff's version of the incident is not limited by any fatal internal inconsistencies in his story, but primarily by the lack of corroboration of his testimony.  Therefore, although Plaintiff's evidence is open to credibility challenges, the Court finds that it is sufficient to create a genuine issue of fact—one which is undoubtedly material to the resolution of his claim.") (internal quotation marks and citation omitted).

The 2011 and 2012 x-ray reports also provide some support for Bembo's version of events.  On their faces, the reports indicate that Bembo had a normal wrist in 2011 that took a turn for the worse in 2012.  The 2012 x-ray report does not seem to indicate a serious injury, and the Court decided above that the injury could not support a claim of deliberate indifference, but a reasonable jury could view it as a prelude to the surgery that Bembo underwent a few months later.  Defendants have summoned two medical experts to challenge whether the 2011 x-ray looked

normal and whether any changes in 2012 could be considered significant.  A reasonable jury can

choose defendants' preferred interpretation of the x-rays and x-ray reports but does not have to do

so just because Bembo did not retain his own expert.  Bembo's failure to obtain his own medical

expert does not change how the x-ray reports could be seen as consistent with his version of events.

*See* FRCP 56(c)(1)(A) (documents and other materials in the record can be cited to demonstrate a

genuine dispute over material facts); *Floyd v. Caruso*, No. 2:04-CV-282, 2011 WL 4005370, at *1

(W.D. Mich. Sept. 8, 2011) (citing FRCP 56(c)(1)(A) and denying summary judgment on an

excessive-force claim, where a *pro se* plaintiff cited to his verified complaint, his affidavit, and his

medical records).  With or without his own medical expert, Bembo would need facts in the record

to support a claim for compensatory damages, and the 2011 and 2012 x-ray reports provide those

facts.[2]  *See Mount Vernon Fire Ins. Co. v. Abesol Realty Corp.*, 288 F. Supp. 2d 302, 309 (E.D.N.Y.

2003) (finding that even when a party offers an expert opinion, the opinion "must be based on the

record and must not be speculative") (citation omitted); *see also Cogan v. Nat'l R.R. Passenger Corp.*,

No. 1:12-CV-1090 GTS/RFT, 2015 WL 1417130, at *7 (N.D.N.Y. Mar. 27, 2015) (finding that

when any "affidavit is submitted in opposition to summary judgment, contains no factual support

and is unsupported by admissible evidence, it cannot create a question of fact sufficient to

---

[2] Of course, the Court is not forgetting that a jury could award Bembo nominal damages to vindicate his
constitutional rights, without a showing of any other injury.  *See Blyden v. Mancusi*, 186 F.3d 252, 263 (2d
Cir. 1999) ("[C]ertain actions, including the malicious use of force to cause harm, constitute Eighth
Amendment violations *per se*.") (citation omitted); *Amato v. City of Saratoga Springs*, 170 F.3d 311, 314 (2d
Cir. 1999) ("In certain circumstances, a jury could reasonably determine that compensatory damages are
inappropriate even where excessive force was used.  For instance, where a victim's claims of injury lack
credibility, or where the injuries lack monetary value, a jury could reasonably award nominal damages.")
(citation omitted).

withstand summary judgment") (citations omitted).  In all, the factual dispute between the parties about what happened on January 11, 2012 is "genuine" for purposes of FRCP 56, making summary judgment inappropriate at least for the individual defendants.  The Court's recommendation will include leaving the issue of punitive damages for the jury or for a renewed motion under FRCP 50 at the close of Bembo's proof.

With respect to the County of Niagara, the Court needs to take one more step to determine whether the County should face trial on Bembo's claim for excessive force.  "Congress *did* intend municipalities and other local government units to be included among those persons to whom § 1983 applies.  Local governing bodies, therefore, can be sued directly under § 1983 for monetary, declaratory, or injunctive relief where, as here, the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers.  Moreover, although the touchstone of the § 1983 action against a government body is an allegation that official policy is responsible for a deprivation of rights protected by the Constitution, local governments, like every other § 1983 'person,' by the very terms of the statute, may be sued for constitutional deprivations visited pursuant to governmental 'custom' even though such a custom has not received formal approval through the body's official decisionmaking channels."  *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690–91 (1978) (citations omitted).  That said, the involvement of a governing body in an alleged constitutional violation must be direct.  "[A] municipality cannot be held liable solely because it employs a tortfeasor—or, in other words, a municipality cannot be held liable under § 1983 on a *respondeat superior* theory."  *Id.* at 691.  The direct involvement of a governing body has to come

from representatives of that body with the authority to establish policies and practices. "[W]e hasten to emphasize that not every decision by municipal officers automatically subjects the municipality to § 1983 liability. Municipal liability attaches only where the decisionmaker possesses final authority to establish municipal policy with respect to the action ordered . . . . We hold that municipal liability under § 1983 attaches where—and only where—a deliberate choice to follow a course of action is made from among various alternatives by the official or officials responsible for establishing final policy with respect to the subject matter in question." *Pembaur v. City of Cincinnati*, 475 U.S. 469, 481–83 (1986) (citations omitted). The deliberate choice to follow a course of action must connect to a specific constitutional violation. "*Monell* does not provide a separate cause of action for the failure by the government to train its employees; it *extends* liability to a municipal organization where that organization's failure to train, or the policies or customs that it has sanctioned, led to an independent constitutional violation." *Segal v. City of New York*, 459 F.3d 207, 219 (2d Cir. 2006) (citations omitted).

Here, the County has satisfied its burden of showing no genuine issue of material fact concerning its involvement in the events of January 11, 2012. The core of Bembo's claim for excessive force is the use of wrist compliance and mandibular pressure, and the contacts between Bembo's head and the elevator wall. There was some deposition testimony about training for the wrist-compliance technique. Who designed and carried out that training is not clear in the record. (*See* Dkt. No. 31-6 at 10–11 (reference to the "CERT academy"); Dkt. No. 31-7 at 9–10 (reference to "an extra two-week academy" apart from basic corrections training).) In any event, Bembo had time during discovery to name a specific policy implicating the County and has not done so.

19

Bembo has not cited to any policies or decisions from policymakers that would be implicated in the elevator incident.  The reference to negligent training that Bembo attempted at oral argument does not suffice to establish a considered decision by the County that carries regulatory force.  *Cf. Saldana v. Vill. of Port Chester*, No. 09 CIV. 6268 RO, 2011 WL 940206, at *1 (S.D.N.Y. Mar. 16, 2011) ("Plaintiff's negligence claims, specifically with regard to the hiring, retention, supervision, and training of Defendant law enforcement officers, must be dismissed because Plaintiff fails to allege an essential element of negligence—that Defendant knew or should have known that the law enforcement officers had a propensity to act in the manner alleged in this action."); *compare Ceparano v. County of Suffolk*, No. 10-CV-2030 SJF AKT, 2013 WL 6576817, at *7 (E.D.N.Y. Dec. 13, 2013) ("[P]laintiff has presented no admissible evidence to support his conclusions that the County has a custom or policy to instruct corrections officers to use excessive force or destroy inmates' property.") *with* Dkt. No. 54 at 27 ("[W]e can't speak to a specific policy that was in place for the injury that was caused on that date, so I would agree with that to that extent . . . .").  Whether a jury ultimately believes Bembo or not, Bembo's claim of excessive force is better cast as intentional, rogue conduct by individual corrections officers who did not consult the County before acting.  Under these circumstances, the County as a governmental entity had no direct involvement in the events of January 11, 2012.  The Court accordingly recommends granting defendants' motion as to the second claim of the complaint, for the County only.

### D.  *Intentional and Negligent Infliction of Emotional Distress*

Finally, the Court will address Bembo's two claims for emotional distress.  Under New York law, intentional infliction of emotional distress is an intentional tort subject to the state's

one-year limitations period for those torts.  *See, e.g., Mariani v. Consol. Edison Co. of New York*, 982

F. Supp. 267, 273 (S.D.N.Y. 1997) ("It is well established that the one–year statute of limitations

set forth in CPLR § 215(3) for intentional torts is applicable to claims for intentional infliction of

emotional distress.").  Additionally, "[u]nder New York law, a cause of action for intentional

infliction of emotional distress is limited to conduct that occurred within the one-year period

immediately preceding the commencement of the action.  When applying the one-year statute of

limitations to claims of intentional infliction of emotional distress, all acts occurring before the

limitations period are excluded from consideration."  *Myers v. People of the State of New York*, No.

114CV1492LEKCFH, 2016 WL 2636295, at *4 (N.D.N.Y. May 9, 2016) (internal quotation and

editorial marks and citations omitted).  Here, Bembo has not alleged any acts by defendants

outside of those that occurred while he was at the Niagara County Jail.  While Bembo has focused

almost exclusively on the events of January 11, 2012, the last possible date when defendants could

have acted tortiously against Bembo was February 2, 2012, the date of his release.  Bembo did not

file his complaint until April 26, 2013, meaning that he would be limited to alleging intentional

torts that occurred on April 26, 2012 or later.  Since none of the alleged events at the Niagara

County Jail occurred on April 26, 2012 or later, the third claim in Bembo's complaint is untimely.

Even if Bembo's claim for intentional infliction of emotional distress somehow were

timely, he has not made enough of a showing to send the claim to trial.  "The tort has four

elements: (i) extreme and outrageous conduct; (ii) intent to cause, or disregard of a substantial

probability of causing, severe emotional distress; (iii) a causal connection between the conduct and

injury; and (iv) severe emotional distress.  The first element—outrageous conduct—serves the dual

21

function of filtering out petty and trivial complaints that do not belong in court, and assuring that

plaintiff's claim of severe emotional distress is genuine.  In practice, courts have tended to focus on

the outrageousness element, the one most susceptible to determination as a matter of law." *Howell*

*v. New York Post Co.*, 612 N.E.2d 699, 702 (N.Y. 1993) (citations omitted).  "Indeed, of the

intentional infliction of emotional distress claims considered by this Court, every one has failed

because the alleged conduct was not sufficiently outrageous.  Liability has been found only where

the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all

possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized

community." *Id.* (internal quotation marks and citations omitted); *accord Chanko v. Am. Broad.*

*Companies Inc.*, 49 N.E.3d 1171, 1178 (N.Y. 2016).  Further, "the New York Court of Appeals has

questioned whether an intentional infliction claim can ever be brought where the challenged

conduct falls well within the ambit of other traditional tort liability.  All four Appellate Division

courts have answered the question and held that it cannot." *Salmon v. Blesser*, 802 F.3d 249, 256

(2d Cir. 2015) (dismissing a claim for intentional infliction of emotional distress against the police

officer that could have been brought as a battery).  Here, construing all facts and inferences as

favorably as possible for Bembo would produce a narrative that contained unnecessary use of wrist

compliance and mandibular pressure, and an intentional banging of Bembo's head into an

elevator wall.  Such a narrative certainly would be reprehensible, but the New York Court of

Appeals has set the bar for intentional-infliction claims so high that even the most favorable

possible narrative for Bembo would not transcend all possible bounds of decency.  Bembo also has

not raised a genuine issue of material fact as to what severe emotional distress he suffered.  The

22

claim as against the individual defendants could have been brought as a battery.  Finally, with respect to the County, New York "public policy bars claims sounding in intentional infliction of emotional distress against a governmental entity."  *Lauer v. City of New York*, 659 N.Y.S.2d 57, 58 (N.Y. App. Div. 1997) (citations omitted); *see also Saldana*, 2011 WL 940206, at *1 (noting that "public policy in New York precludes claims for intentional infliction of emotional distress brought against a governmental entity").  The claim for intentional infliction of emotional distress thus must fail.

Bembo's claim for negligent infliction of emotional distress does not fare much better.  "A cause of action for either intentional or negligent infliction of emotional distress must be supported by allegations of conduct by a defendant so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.  We have applied the same standard to both the intentional and negligence theories of emotional distress."  *Dillon v. City of New York*, 704 N.Y.S.2d 1, 7 (N.Y. App. Div. 1999) (citations omitted); *accord, e.g., Burger v. Singh*, 915 N.Y.S.2d 113, 115 (N.Y. App. Div. 2010) (citations omitted).  As with the intentional-infliction claim, the most favorable possible narrative for Bembo would leave him with a battery; the next most favorable narrative would leave Bembo with negligent or recklessly rough handling at the hands of Phillips, Shawver, and Kolbe. The Court never would condone that kind of behavior if proven true, but such behavior still would fall short of the very high standard that New York has established for conduct that is utterly intolerable in civilized society.  *See also Banker v. County of Livingston*, 782 F. Supp. 2d 39, 49 (W.D.N.Y. 2011) (citations omitted).  Combined with Bembo's failure to raise a triable question of

23

fact about severe emotional distress, the negligent-infliction claim fails in the same way as the intentional-infliction claim.

## IV.   CONCLUSION

For all of the foregoing reasons, the Court respectfully recommends granting defendants' motion (Dkt. No. 31) with respect to the first, third, and fourth claims in Bembo's complaint. With respect to the second claim in Bembo's complaint, the Court recommends granting defendants' motion as to the County of Niagara and denying it as to the individual defendants. The Court further recommends deferring on punitive damages, costs, and fees at least until the close of Bembo's proof at trial, when defendants can make a motion under FRCP 50 if they wish.

## V.   OBJECTIONS

A copy of this Report and Recommendation will be sent to counsel for the parties by electronic filing on the date below.  Any objections to this Report and Recommendation must be electronically filed with the Clerk of the Court within 14 days.  *See* 28 U.S.C. § 636(b)(1); FRCP 72.  "As a rule, a party's failure to object to any purported error or omission in a magistrate judge's report waives further judicial review of the point."  *Cephas v. Nash*, 328 F.3d 98, 107 (2d Cir. 2003) (citations omitted).

SO ORDERED.

__/s Hugh B. Scott_____
HONORABLE HUGH B. SCOTT
UNITED STATES MAGISTRATE JUDGE

DATED: August 31, 2016

24